# HORACE BURTON

*v.*

# GEORGE CURYEA.

1. SALE OF CHATTELS — *where the vendor has no right to sell, no title passes.* On the sale of chattels, the subject of sale must belong to the vendor, and he can sell no more than the interest which he lawfully has.

2. So if a bailee of goods for a particular purpose transfers them to another in contravention of that purpose, no title will pass, and the general owner may recover them, even though the transfer be to a *bona fide* vendee.

3. SAME — *by the transfer of documentary evidence of title.* Nor will the vendee of chattels acquire a title if the vendor has none to transfer, even when the sale is made or confirmed by the transfer of a bill of lading or other document of the same nature, symbolizing and describing the property sold.

4. WAREHOUSE RECEIPTS — *whether they are negotiable.* So receipts given by a warehouseman for chattels placed in his possession for storage purposes, are not, in a technical sense, negotiable instruments, but they merely stand in the place of the property itself, and a delivery of the receipts has the same effect in transferring the title to the property, as the delivery of the property, neither more nor less.*

5. Where warehouse receipts for a lot of pork were delivered to a purchaser, indorsed in blank by the original holder, and were afterward delivered back to such original holder for a specific purpose, a subsequent transfer of

---

* NOTE BY THE REPORTER. The twelfth section of the act entitled "*An act regulating warehousemen, and authorizing connections of railroads with warehouses, and for other purposes,*" approved February 16, 1867, reads as follows:

"§ 12. All receipts for grain issued by any warehouse shall be negotiable, by indorsement in blank or by special indorsement, in the same manner and to the same extent as bills of exchange and promissory notes are." (Sess. Acts 1867, p. 180.)

the receipts by such holder, to a third person, even to a *bona fide* vendee, in contravention of such purpose, will not ·pass the title to the property which they represent, and the general owner, the original purchaser, may, notwithstanding such transfer, maintain replevin for the property against the warehouseman, in whose possession it still remains.

6.  Such is the common law rule, and the act of 1851, to prevent frauds by warehousemen, was not designed to change it.

7.  Had the owner of the property placed the warehouse receipts in the hands of the original holder for any other than a legitimate purpose, or if he were fairly chargeable with any negligence by means of which the one having the receipts in possession was enabled to impose upon the party to whom he transferred them, a different rule might prevail.

8.  But it was not negligence on the part of the owner because he omitted taking new receipts in his own name after he purchased the property, and putting them in the hands of his vendor, instead of delivering to him the old receipts which were given in his name.

9.  Nor, it seems, was it necessary that the purchaser should give the warehouseman notice that he had purchased the pork.

10.  But where the party to whom the receipts were transferred without authority, made no inquiry at the warehouse in reference to the ownership of the property, the question whether the owner should have given notice of his purchase, or taken out new receipts, could not properly arise, as, not having inquired at the warehouse, he could not be injured by the want of notice there, and it would not belong to him to complain.

11.  EVIDENCE—*its admissibility.*  Where the owner of the property, the warehouse receipts for which had been transferred without authority, brought replevin against the warehouseman, a receipt given to the plaintiff for those warehouse receipts by the party to whom they were delivered, stating the purpose for which they were delivered, was *prima facie* admissible in evidence on behalf of the owner.

12.  SAME—*motion to exclude evidence, on a specific ground.*  If upon testimony given after such receipt was admitted in evidence, a question should arise as to its admissibility by reason of its being alleged to bear date subsequent to the wrongful transfer of the warehouse receipts, it seems a motion should be made to exclude the receipt upon that ground, so as to afford an opportunity for an explanation of the question of dates.

13.  AFFIDAVIT IN REPLEVIN—*its requisites.*  An affidavit in replevin stated that the plaintiff "being duly sworn, says on oath, that he is lawfully entitled to the possession of 500 barrels of prime mess pork, for which he brings suit in replevin against Horace Burton, and which is about to be replevied, and which said pork is wrongfully detained from this deponent by the said Horace Burton," etc.  This was sufficient.

21—40TH ILL.

Appeal from the Superior Court of Chicago; the Hon. Joseph E. Gary, Judge, presiding.

This was an action of replevin brought in the court below, by George Curyea against Horace Burton. The following is the affidavit filed as the basis of the action:

"George Curyea, being duly sworn, says on oath, that he is lawfully entitled to the possession of five hundred barrels of prime mess pork, for which he brings suit in replevin against Horace Burton, and which is about to be replevied, and which said pork is wrongfully detained from this deponent by the said Horace Burton. And this deponent further says, that said property has not been taken for any tax, assessment or fine levied by virtue of any law of this State, nor seized under any execution or attachment against the goods and chattels of said plaintiff (deponent), liable to execution or attachment. Also that said property is of great value, to wit: of the value of ten thousand dollars."

A trial resulted in a verdict and judgment for the plaintiff. The defendant brings the case here by appeal. Objection is taken to the sufficiency of the affidavit, because, first, it does not set out a description of the property; second, it does not show that the plaintiff is entitled to the present or immediate possession; third, it does not contain the necessary positive averments, and states conclusions of law instead of facts.

The other and more important questions presented, and the facts upon which they arise, are fully stated in the opinion of the court.

Messrs. Haines & Story, for the appellant.

Messrs. Arrington & Dent, for the appellee.

Mr. Justice Lawrence delivered the opinion of the Court:

This was an action of replevin brought by Curyea against Burton to recover five hundred barrels of pork. The facts were as follows: Daggett & Whiteside were pork-packers in

the city of Chicago, and about the 1st of January, 1865, sold to Curyea five hundred barrels, and delivered to him five warehouse receipts of Burton, the appellant, who had the pork on storage in his warehouse. By the terms of the receipts the pork was deliverable to the order thereon of Daggett & Whiteside, upon the surrender of the receipts and the payment of charges. The receipts were indorsed in blank by Daggett & Whiteside. Subsequently to the purchase by Curyea he desired to have the pork overhauled and repacked, and in order that this might be done by Daggett & Whiteside, he delivered the receipts back to them. They thereupon pledged the receipts to a bank called the State Savings institution as security for advances of money, and on the 15th of June, 1865, the bank sold them to Michael Leary, Daggett & Whiteside having failed to pay their debt to the bank, and become insolvent. It should be further stated that when, in January, Curyea wished to complete the payment upon the pork to Daggett & Whiteside, he borrowed the money, through the agency of the bank, from one Jared Gage, and the bank took his note payable to Gage, and took as security these five receipts calling for one hundred barrels each. The cashier testifies that the bank had at that time more than these five receipts on deposit belonging to Daggett & Whiteside, and he selected five from the parcel, and pinned them to the note given by Curyea, and passed the amount of Gage's check to the credit of Daggett & Whiteside. The note was paid the last of March and the cashier then gave the receipts to Curyea. He further testifies that the bank had at various times from twelve to fifteen of these receipts deposited by Daggett & Whiteside, each calling for one hundred barrels, and that when he received the five receipts from them in June which the bank subsequently sold to Leary, he did not know they were the same receipts delivered in March to Curyea, and that they kept no record of numbers or dates. Soon after Leary bought he was about to remove the pork from Burton's warehouse, when Curyea commenced this action of replevin against Burton. Burton pleaded property in Leary and property in

himself. On the trial, the plaintiff tendered Burton his ware-house charges, which he accepted, and the only issue presented to the jury was the question of ownership as between Curyea and Leary, who, though not a party to the record, was repre-sented by counsel. There was a verdict for the plaintiff on this issue upon which judgment was rendered and the defend-ant appealed.

The court instructed the jury as follows:

"The court instructs the jury that the main question in this case is, whether the pork in controversy belongs to the plaintiff or to Michael Leary. Each of them claim through Daggett & Whiteside, and therefore it is to be taken as true that Daggett & Whiteside once owned the pork. Then if the plaintiff bought it from them and received from them or from the State Savings institution, with their assent, the warehouse receipts in evidence, this gave him a good title to the pork, of which he could not be deprived without his consent, except under special circumstances herein after stated. But upon this part of the case the burden of proof is upon the plaintiff to show that these receipts are the ones which he received—and if that is not established by the testimony to the satisfaction of the jury, their verdict on the ownership of the pork will be in favor of the defendant. If, however, these receipts are the same, then, if the plaintiff put or left them in the hands of Daggett & Whiteside, with nothing upon the receipts to indi-cate that they were not the owners of the pork mentioned therein, and if Daggett & Whiteside were not simply agents or commission merchants, doing business for other persons, but were, and publicly known to be also packers of pork, and dealers in pork and other produce on their own account, then any person dealing with Daggett & Whiteside as owners of the pork, believing them to be such owners, and having no notice of any circumstances to excite a reasonable suspicion that they were not such owners, would be protected in dealing, in the ordinary course of business, with Daggett & Whiteside as owners of the pork, even if Daggett & Whiteside were as to the pork only agents of the plaintiff, with no further authority

than simply to overhaul or repack the pork. But the burden of proof is upon any person claiming under a pledge by Daggett & Whiteside, to show the circumstances of the transaction, and to show that the pledge was in the usual course of business, and for a valuable consideration, and the title of Mr. Leary derived under such a pledge to the State Savings institution, can be no better than was their title. If, therefore, the jury find from the evidence that the pork belonged to the plaintiff, and was pledged by Daggett & Whiteside without his authority, then unless such pledge was in the ordinary course of business, for a valuable consideration, and protected by the principles herein before stated, their verdict as to the ownership of the pork should be in favor of the plaintiff.

" The warehouse receipts are not negotiable in the legal sense, so as to enable the person holding them to transfer a greater right or title to the property mentioned in them than he himself had. Their only office is to stand in the place of the property itself, so far as the questions involved in this case are concerned, for the convenience of the parties interested in the property. The delivery of the receipts has the same effect as the delivery of the property, no greater and no less.

" The possession by Daggett & Whiteside of the warehouse receipts, making the pork deliverable to their order, has the same effect as if the pork had been in their own warehouse, and pledging by delivering the receipts has the same effect as if the pork had been delivered by moving the barrels to another warehouse.

" The principle which is involved in these instructions, and which it is attempted to explain, is, that though a man cannot be deprived of his property without his consent, and a principal is not bound by the unauthorized act of his agent, yet he is bound by every act on his own part, which gives his agent an apparent authority upon which other persons rely to do the act, the validity of which may be in question—and therefore the inquiry in such cases is, whether the agent's possession of the property, or of the documentary evidence of title thereto, was necessary for the ordinary business of life, or

authorized by the custom of trade, or whether the possession and other circumstances of the transaction, were unusual or unnecessary, and of a nature to mislead other persons as to the title to the property.

" And this is a question solely for the jury to decide upon the evidence, which the court has no right, and has had no intention to express or hint any opinion upon.

" It is conceded by the parties that the verdict as to the other issues is to be for the defendant; but these issues do not affect the right of property, and nothing said or done here in court by the parties in relation to those issues is to have any effect upon the issue as to the right of property."

It is insisted by the counsel for the appellant, that the second and third paragraphs of this instruction, in which the jury are told that the warehouse receipts are not, in a technical sense, negotiable, but that they merely stand in the place of the property itself, and that the delivery of the receipts has the same effect as the delivery of the property, neither more nor less, should not have been given. It is urged that warehouse receipts should be treated as negotiable paper and that this is required by the exigencies of commerce. In regard to this position, and the reasons urged in its support, we can only say, if it be desirable that these instruments should be placed upon this footing, it belongs to the legislature to make the rule. Such is certainly not now the law as it has been expounded by the highest authorities both of England and of this country, and it is our province to declare the law as it is written. It is true, it is one of the excellencies of the common law, that its principles can be adapted by the courts to new emergencies as they arise in the rapid development of modern society, but this flexibility of the system in judicial hands should be confined to the new application of settled principles, or of principles in harmony with those that are settled, and should not be extended to the making of new rules that are really in violation of maxims lying at the foundation of our law and as old as the law itself. When this power is assumed by courts, they become not the expounders but the makers of the law.

This precise question is discussed in 1 Smith's Leading Cases, 1086, sixth edition (marg. page 894), and the cases are fully reviewed by the learned editors of that work. It is therefore unnecessary for us to review them here. They all speak the same voice. The principle applied in all, is that the delivery of warehouse receipts is a symbolic delivery of the property itself, that it has the same effect as the delivery of the property, and can have no greater, and that a transfer of the warehouse receipt, by the person in possession of it, gives no higher title than would the transfer of the property by the same person. The American editors, in their very elaborate note to the case of *Lickbarrow* v. *Mason*, 1 Smith's L. C. 895, use the following language : " An effort was, however, made in the earlier part of this century to give a greater effect to the delivery of the symbol than to that of the thing which it represented, and to treat the holder of a dock or East India warrant for goods as entitled to pass the right of property in the goods to third persons in the absence both of title and authority in himself, or in other words, to render these instruments negotiable and give them the power of creating a title by their transfer, in cases where none existed before they were transferred. The cases of *Zwinger* v. *Samuda*, 7 Taunt. 265, and *Lucas* v. *Dorrein*, id. 278, seem to have been understood as determining this point as to dock warrants and, the principal case, as to bills of lading. But although the language held by the *puisne* judges of the Court of Common Pleas, in the absence of the chief justice, in *Zwinger* v. *Samuda* and *Lucas* v. *Dorrein*, tends to justify this conclusion, yet it was not necessarily or properly involved in the decision of those cases, which rest substantially on other grounds, and has not been adopted either by the courts or the profession as law. Subsequently to these decisions the statute, 6 Geo. IV, c. 94 (which was extended in England by the 5 and 6 Victoria, c. 39, and followed in New York and Pennsylvania by the act of April 14, 1834, in the one State, and that of April 16, 1834, in the other) provided that persons intrusted with the possession of bills of lading, dock warrants, or other documents of title to goods, should

have the power to make contracts for the sale, disposition or pledge of such goods, which should be binding as against the true owner. It is evident from the language of this act, and from the decisions that have been made under it, that the power thus given is purely statutory, and was unknown to the common law. Thus in *Evans* v. *Truman,* 2 B. & A. 886, and *Taylor* v. *Kymer,* 3 id. 320, where advances were made to a broker on the faith of his possession and apparent ownership of East India warrants for indigo, deliverable to order, it was held that as the case did not come within the remedial provisions of the statute the party who made the advances acquired no interest either in the warrants themselves or in the indigo which they represented. The same point has since been decided in a number of other cases. *Bonzi* v. *Stewart,* 4 Man. & Gr. 295, 326; *Phillips* v. *Huth,* 6 M. & W. 572; *Hatfield* v. *Phillips,* 9 id. 647; 14 id. 665. And the true rule of law with regard to the effect of the transfer of the documentary evidence of the title to goods, on the goods themselves, is conclusively shown by the case of *Newsom* v. *Thornton,* 6 East, 17, where the indorsee, for value of a bill of lading, was held to acquire no interest under the indorsement, because it was a departure from the authority given by the owner to the indorser, although the transaction would necessarily have taken effect as a negotiation, if such instruments were really negotiable. The recent cases follow in the same direction, and show that the vendee of chattels will not acquire a title if the vendor has none to transfer, even when the sale is made or confirmed by the transfer of a bill of lading or other document of the same nature, symbolizing and describing the property sold. *Brewer* v. *Peabody,* 3 Kernan, 121; *The Mechanics' Bank* v. *The N. Y. & N. H. R.R. Co.,* id. 599, 628; *Dows* v. *Perrin,* 16 N. Y. 325; *Gurney* v. *Behrend,* 3 Ellis & B. 122."

"Nothing," it is further remarked in the same note, on page 896, "could in fact be a greater departure from the principles and analogies of the common law, than to treat bills of lading or other documentary evidence of title to chattels personal, as negotiable instruments. Instruments which represent choses

in action may be negotiable, because the right cannot be separated from the instrument, and has no distinct or actual physical existence. And even then, negotiation only exists in the case of actual promises for the payment of money, a thing negotiable in itself, and which cannot be reclaimed by the true owner, from any who has received it *bona fide*, and in exchange for a valuable consideration. But chattels personal are wholly insusceptible of negotiation in themselves, and it is manifestly inconsistent to give the documents which represent them a different character. * * * The law has recently been changed by statute in England, but still remains on its original footing in most, perhaps in all parts of this country. *Blanchard* v. *Page*, 8 Gray, 281, 298." Our act of 1851 to prevent frauds by warehousemen was ◗early not designed to change the rule of the common law. Neither does the case of *Underwood* v. *Hossack*, 38 Ill. 208, hold warehouse receipts to be negotiable. It rests upon different principles.

The transfer of the warehouse receipts from Curyea to Daggett & Whiteside, having then the same effect as would have had the delivery of the property into their possession and no more, the question arises whether if they had taken the pork from Burton's warehouse to their own packing house and had then sold or pledged it, the title of Curyea would have passed. In a note to the case of *Wilbraham* v. *Snow*, 2 Saunders, 47, Sergeant WILLIAMS, referring to Brooke's Ab., says : "*It is said* that if a bailee sells and delivers the goods to another as his own, *bona fide*, and without notice, the general owner can not maintain trover or any other action against the vendee." The same doctrine is stated in Sheppard's Epitome, referring also to Brooke, with a *quære*. The Supreme Court of Massachusetts in the case of *Stanly* v. *Gaylord*, 1 Cush. 545, referring to these authorities says : "no adjudged case, it is believed, is to be found in the English books, which sustains the doctrine cited by Brooke and others from the year books. And it is now the settled law of England, that the subject of sale must belong to the vendor, and that he can sell no more than the interest which he lawfully has. In the last edition of Saunders, to

which additional notes are made by Patterson and E. V. Williams (now judges in England), the following passage is subjoined to the note above quoted from Sergeant Williams: 'However, in modern cases it has been held that if a bailee of goods for a particular purpose, transfers them to another in contravention of that purpose, the general owner may maintain trover against that person even though he be a *bona fide* vendee, unless in market overt.' The same doctrine is also laid down in Long on Sales (Rand's ed.) 167; Hilliard on Sales, 23; 2 Kent's Com. 324; *Cooper* v *Willomatt,* 1 Man. Grang. & Scott, 672; *Roland* v. *Gundy,* 5 Hammond, 202; *Metcalfe* v. *Lumsden,* 1 Car. & Kirw. 309." The court adds that the law of Massachusetts was like the law of England on this subject except as to sales in market overt.

The law of this State is very conclusively settled in the same way in *Fawcett, Isham & Co.* v. *Osborne, Adams & Co.,* 32 Ill. 425, which was a well considered case. In that case the plaintiffs, who were leather dealers, had furnished hides to certain tanners, to be made into leather and returned to the plaintiffs, who were not to lose their property in the hides. The tanners sent the leather, or a part of it, to Chicago, and sold it to the defendants, who were in no way parties to the fraud, but innocent purchasers. The court held that the plaintiffs had not lost their property by this unauthorized sale by their bailees. In that case the counsel for the purchasers cited *Jennings* v. *Gage,* 13 Ill. 611, and *Brundage* v. *Camp,* 21 id. 330, which are also cited in the case before us, and the court remarks, in reference to these and other cases of the same general character, that "in all these cases the property was transferred to the purchaser, by the consent of the owner, under the form of a regular sale and delivery, and therein differ in a most important particular from the case we are considering." The court further add what is equally applicable to the present case: "Here has been no transfer of the property by the consent of the true owners, nor have they, voluntarily, under the form of a sale, delivered the property to the defendant's vendor, or clothed him with any of the

*indicia* of ownership, in the sense and meaning of any of the cases cited. We apprehend no well considered case can be found in the books, where a party has been deprived of property without his consent, or where a party selling has been adjudged competent to convey to a purchaser a better title than he himself possessed." The court excepts from this remark, cash and negotiable instruments.

If Curyea, in the case before us, had placed the warehouse receipts in the hands of Daggett & Whiteside for any other than a legitimate purpose, or if he was fairly chargeable with any negligence by means of which they had been enabled to impose upon the bank, a different rule might be applied. But we can discover no negligence on his part, nor any departure from the ordinary course of business. He certainly had the right to have his pork repacked, and to employ Daggett & Whiteside, who had packed it in the first instance, for that purpose. To accomplish this it was necessary to enable them to remove the pork from Burton's warehouse, and this could only be done by the surrender of the warehouse receipts. It was indispensable, then, to let Daggett & Whiteside have these receipts in order to get the pork repacked. It is suggested that Curyea should have surrendered these receipts and taken new ones in his own name and thus have advised persons dealing with Daggett & Whiteside that he had title to the pork, and enabled them to inquire of him. But how would this have guarded the bank or any other persons against the fraud of Daggett & Whiteside? Suppose Curyea had taken out new receipts. It would still have been necessary for him to indorse and deliver them to Daggett & Whiteside in order to enable them to withdraw the pork, for it would only have been deliverable on the order of Curyea and on the surrender of the receipts. And the receipts being once in the custody of Daggett & Whiteside it would have been perfectly easy for them, if they desired to perpetrate a fraud upon the bank, to have surrendered the receipts issued to Curyea and taken out new ones running directly to themselves, or to have removed the pork to another warehouse and to have taken receipts to

themselves from the new warehouseman. They would then have had precisely the same kind of receipts for their fraud upon the bank that they had in the actual case. We repeat that we do not see what steps Curyea could have taken which would have guarded the public against such a fraud as Daggett & Whiteside perpetrated, it being conceded that it was proper to employ them to repack the pork.

Whether, however, it was the duty of Curyea to notify the warehouseman of his purchase of the pork, or to take out new receipts in his own name, is a question not presented by the evidence in this case, for neither the officers of the bank nor Leary ever applied to the warehouseman for information concerning the title to the pork. Even if it be conceded then, that Curyea was guilty of some degree of negligence in not giving notice to the warehouseman, neither the bank nor Leary was injured by it, as they made no inquiries at the warehouse, and not having been injured it does not belong to them to complain.

It is asked what security there is in loaning money upon a pledge of warehouse receipts? We answer, precisely the same security as in loaning upon the pledge and delivery of the property itself. If the person pledging the property is the owner, the security is good to the extent of its value, and so of the warehouse receipts. But if he is not the owner, if he has stolen it, or if he is a bailee merely, and is attempting to make a fraudulent use of the property intrusted to his keeping, a person purchasing or receiving the property as security, does so in subordination to the title of the true owner. These are risks which men engaged in business must be content to encounter, and against which the law can afford them no protection. The law can punish roguery, but it cannot secure innocent persons against losses from its multiform devices.

Whether, as urged by counsel, the demands of commerce really require that warehouse receipts should be advanced to the dignity of negotiable paper, is a question which it is not our province to decide. Much may be said in its favor, but only experience could determine its wisdom. While it would

undoubtedly render more facile and safe some of the transactions of trade, it should also be remembered that the greater the activity of commerce, the more are the owners of personal property obliged to intrust it to the various classes of bailees and agents; and the establishment of this rule might be found, in practice, to introduce an element of peril to the rightful owners which would more than counterbalance its advantages, and which would certainly be opposed to the genius of the common law.

Counsel also object to the first paragraph of the instruction. It seems to conflict, in some degree, with that portion upon which we have commented; but, whatever errors are to be found in it, are in favor of the appellant.

It is urged by counsel for the appellant that the following receipt from Daggett & Whiteside to Curyea was improperly admitted in evidence:

"Rec'd, Chicago, June 6th, 1865, of Geo. Curyea, receipts of five hundred brls. prime mess pork, stored at Horace Burton's, which we are to overhaul and repack.
                                "DAGGETT & WHITESIDE."

| { "U. S. Rev. Stamp.<br>2 cents.  D. & W.<br>June 6, '65. } | { 5 cents U. S. Rev. Stamp.<br>Stamp duty paid in presence of collector of first<br>District of Illinois, Sept.<br>25, 1865.<br>T. DURAND, Dep. Collr. } |

[Seal of Collector.]

"P. S. We have had the pork fully insured, and will look well after it; would advise to hold on, and you will come out all right on it.                    "Yours,
                                "DAGGETT & W."

The signature of Daggett & Whiteside was proven, and the instrument itself was a part of the *res gestæ*, and an admission, against their own interest, that they did not own the property. It is said, it appears by the testimony of Beckford, the cashier, that it bears a date subsequently to the pledge of the warehouse receipts to the bank. But his testimony on this point is

extremely indefinite. He says he sold the receipts to Leary about the 15th of June, and that they were pledged to the bank some two or three weeks previous. The receipt had already been admitted before Beckford was placed on the stand, and no motion was made to exclude it, founded upon his testimony, although it was objected to when it was offered. Had such a motion been made the question of dates would have been open for explanation and might have received it. It is not necessary to decide whether the receipt in itself would have been admissible if it had been shown to have been executed after the pledge to the bank. *Prima facie* it was admissible when it was offered and received.

It is also objected, that it is not clearly proven, that the five warehouse receipts sold by Daggett & Whiteside to Curyea, were the receipts pledged to the bank and sold to Leary. This is a point upon which the jury passed, and although the proof is not clear, we think there is sufficient to sustain the verdict.

The affidavit upon which the writ was issued was objected to, but it was substantially in the language of the statute, and sufficient.

The judgment must be affirmed.

*Judgment affirmed.*