THE CANADIAN BANK OF COMMERCE

*v.*

SAMUEL H. McCREA et al.

*Filed at Ottawa November 20, 1882.*

1. NEGOTIABLE INSTRUMENTS—*warehouse receipts.* The statute in relation to negotiable instruments does not embrace warehouse receipts or bills of lading, and instruments of that class. Such instruments are not thereby placed on the same footing, as respects the title vested in the assignee in case of assignment, as bills of exchange and promissory notes. The ruling in *Burton* v. *Curyea,* 40 Ill. 320, on this question is adhered to.

2. SAME—*the statute construed as to what instruments are negotiable.* The statute relating to negotiable instruments does not embrace covenants or agreements for the performance of individual services in and about property,—mutual, dependent and conditional covenants and agreements to pay money or deliver property upon uncertain contingencies and events,—but applies only to absolute and unconditional promises to pay money or deliver property, or to instruments payable at some time certain, absolutely.

3. In order to impart to the paper the quality of negotiability, within the statute, the promise or undertaking must be restricted to the payment of money or the delivery of property at a time that will certainly happen,

although it may be unknown in advance when that will be. And although it may be within the power of the party to whom the promise is made to render it certain, by his subsequent act, that the time will happen, this will not be sufficient. It can not depend on his will or pleasure.

4. SAME—*nature of the contract evidenced by a warehouse receipt, as depriving it of the qualities of negotiable paper.* A warehouse receipt is strictly but the written evidence of a contract between the depositor of grain and the warehouseman. It is an acknowledgment by the latter that he has received and holds in store for the former the amount and description of grain named in the receipt, and from this acknowledgment the law implies certain duties as devolving upon the warehouseman, which become as much a part of the contract as if written at length in the receipt. The liability of the warehouseman, as resulting from these duties, depends upon certain conditions, which are recognized both by the common law and the statute, and under which it may be the liability will never accrue, and this element of uncertainty in that regard operates to prevent the character of negotiability from attaching to a warehouse receipt.

5. SAME—*what effect to be given to assignment of a warehouse receipt, under the statute.* By section 24 of the act of 1871, regulating public warehouses, etc., the indorsement of a warehouse receipt is made evidence of a transfer of the grain it represents, the same as the actual delivery of the property itself. But neither of these acts implies that a title which the seller does not possess shall pass. The receipt is made the symbol or representative of the property therein named, and its assignment and delivery by the rightful owner will pass his title to the property. But this statute, making such receipts assignable by indorsement, does not change their nature, and put them, in all respects, on the same footing with instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes.

6. SAME—*subsequent holder of warehouse receipt—rights of the real owner of the grain it represents.* A warehouse receipt stands in the place of the grain it represents, and the possession of the receipt is regarded as the possession in law of the grain itself, and as the warehouseman is not required to surrender the grain until the return of the receipt and the payment of charges, one who obtains it under such circumstances as would charge him with notice of a want of title in his assignor, the real owner may recover of him, in trover, the value of the grain on his refusal to surrender the receipt to him.

7. So where grain in store was sold for cash, and the warehouse receipts representing the same were indorsed and delivered upon a check upon a bank, in payment, which was dishonored, and the purchaser indorsed the warehouse receipts to the bank upon which the check was drawn, under such circumstances as to lead the bank to a knowledge that the purchase was for

cash, and the bank refused to accept and pay the check or to surrender the receipts to the seller, it was *held,* that the seller and former owner of the grain was entitled to recover, in trover, of the bank the value of the grain.

8. SALE OF PERSONAL PROPERTY—*for cash—rights of the seller in case of non-payment.* Where personal property, other than commercial paper, is by contract sold for cash, to be paid for on delivery, the payment and delivery are to be concurrent acts, and in such case, if the goods are put into the possession of the buyer in expectation that he will immediately pay the price, and he does not do it, the seller will be at liberty to treat the delivery as conditional, and he may at once reclaim the goods.

9. PAYMENT—*by check which is dishonored.* An attempted payment by a draft or check which is dishonored, is no payment, and goods sold for cash, and delivered on such check, may be reclaimed.

10. TROVER—*when it lies.* Trover lies for the recovery of goods sold, the possession of which is obtained by an attempted payment by check which is dishonored.

11. CONSTRUCTION OF A STATUTE *changing the common law.* It is a familiar rule of construction, that a statute is not to be construed as changing the common law further than its terms expressly declare.

12. JUDGMENT IN TROVER *brought against wrongful holder of warehouse receipt.* A warehouse receipt stands in the place of the grain it represents. Possession of the receipt is regarded as the possession, in law, of the grain itself, and the warehouseman is not required to surrender the grain until the delivery of the receipt and the payment of charges. So, in trover against a subsequent holder of a warehouse receipt, whose possession is wrongful, as against the plaintiff, the suit to recover the receipt is in effect for the grain the receipt represents; and in recovering for the receipt, therefore, the recovery will be for the value of the grain,—that for which the receipt stands.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS A. MORAN, Judge, presiding.

On Monday, the 20th of September, 1880, appellees sold to H. C. Ranney & Co., upon the board of trade of Chicago, 1737 bushels of No. 2 spring wheat, for $1616.02, *cash.* Delivery of the wheat was made by means of three warehouse receipts issued to appellees, and by them indorsed, calling, respectively, for 488, 864 and 385 bushels of No. 2 spring wheat. The receipts were all in substantially the same form

as that for the 488 bushels, which, together with its indorsement, was as follows:

"ARMOUR, DOLE & Co.

No. B, 4230.                         CHICAGO, *Sept. 16th, 1880.*
          *C. B. & Q. Elevator.*

"Received in store from 232——
Four hundred and eighty-eight bushels of No. 2 spring wheat,
subject only to the order hereon of S. H. McCrea & Co., and
the surrender of this receipt, and payment of charges.

$$\left\{ \begin{array}{c} \text{This grain is subject to our} \\ \text{advertised rates of storage.} \end{array} \right\}$$

"It is hereby agreed by the holders of this receipt, that
the grain herein mentioned may be stored with other grain
of the same quality by inspection; loss by fire or heating at
owner's risk.

          (Signed,)               ARMOUR, DOLE & Co.
          (Countersigned,)                     ARMOUR.
488 Bush.
          (Indorsement.)     In store,
                              S. H. McCREA & Co.
                                   *Per Jennings.*"

Ranney & Co., at the same time, gave appellees their check
of that date for the price to be paid for the wheat, drawn
on the appellant, for $1616.02. Appellees deposited this
check in the usual course of their business, and on Tuesday,
September 21, 1880, it was presented to appellant through
the clearing house, and payment was refused.

Ranney & Co. had been doing business on the board of
trade in Chicago, being chiefly engaged in shipping grain,
during the month of September, 1880. They kept a bank
account with appellant, and the usual course of business,
as claimed by appellant, was, when they were making up a
cargo for shipment, that they be allowed to overdraw their
account, and as soon as the cargo was shipped they should

draw against it, attach the bill of lading as security, and discount the draft at the bank, and have the proceeds placed to their credit, thus paying the advances made by the bank. On Monday morning, September 20, Ranney & Co. took away from the bank warehouse receipts representing 10,000 bushels of wheat, and in the afternoon, between half-past two and three o'clock, carried back receipts for about 5800 bushels of wheat, the value of which, with a deposit made during the day, made their account good. Among the receipts thus carried back were those now in controversy. Appellees claim that appellant received these receipts under such circumstances and with knowledge of such facts as were sufficient to put it upon inquiry as to the title of Ranney & Co. In the afternoon of the day on which payment of Ranney & Co.'s check to appellees was refused, appellees went with the check to appellant, and demanded that it either pay the checks or return the warehouse receipts in controversy. Appellant refused either to pay the check or return the receipts. Other facts material to an understanding of the questions discussed are referred to in the opinion.

Thereupon appellees instituted the present action in the circuit court, which was finally tried as an action of trover, resulting in a verdict and judgment in their behalf, which judgment, on appeal to the Appellate Court for the First District, was affirmed. This appeal is from the last named court.

The circuit court gave to the jury, among others, the following instructions, to which exception was taken:

"4. The jury are instructed that if they find, from the evidence, that the defendant received the warehouse receipts in question from Ranney & Co., and that at the time it so received them it had knowledge of such facts and circumstances as would put a prudent person upon inquiry as to the title of said Ranney & Co., then the defendant will be

deemed, in law, to have had notice of all such facts touching the title of Ranney & Co. to said receipts, as it might, by the exercise of ordinary and reasonable diligence, have ascertained upon inquiry and investigation.

"5. If the jury believe, from the evidence, that the defendant, at the time it received the warehouse receipts in controversy from H. C. Ranney & Co., knew, or with the exercise of ordinary prudence had reason to know or believe, from facts and circumstances then within, or at that time, or any time previous to that time, brought to its knowledge, that the wheat called for in said receipts had been sold to plaintiffs for cash, and that the purchase money for said wheat had not been paid, then the defendant is not an innocent holder of said receipts."

And the court refused to give the following instruction, asked by appellant, to which ruling also there was exception:

"The jury are instructed that it is not enough for the plaintiffs to satisfy the jury, by a preponderance of evidence, that there were connected with the taking of the grain receipts in question, or growing out of the previous dealings between the bank and H. C. Ranney & Co., circumstances which would excite the suspicion of a prudent man, or some circumstances which would make the bank guilty of gross negligence in the taking of the grain receipts, but it is necessary for the plaintiffs to go further, and to satisfy the jury, by a preponderance of evidence, that the bank had actual knowledge that the grain receipts had been sold by the plaintiffs to H. C. Ranney & Co. for cash, and had not been paid for, or such notice that the grain receipts had been sold for cash and not paid for, as would make the taking of the grain receipts by the bank an act of positive bad faith upon its part, and a fraud upon the plaintiffs."

The errors assigned present the questions discussed in the opinion.

Messrs. GRANT, SWIFT & BRADY, for the appellant:

Under the statute of this State warehouse receipts are governed by the law of promissory notes and bills of exchange, so far as the same is applicable. Hurd's Stat. 1881, chap. 114, sec. 142; *Burton* v. *Curyea,* 40 Ill. 320.

As to the contracts made negotiable the same as bills of exchange, by the statute, (chap. 98, secs. 3, 4;) counsel cited *Sappington* v. *Pulliam,* 3 Scam. 385; *Bradley* v. *Morris,* id. 182; *Bilderback* v. *Burlingame,* 27 Ill. 338; *Stewart* v. *Smith,* 28 id. 406; *Archer* v. *Claflin,* 31 id. 315; *Hunt* v. *Devine,* 37 id. 143.

The possession of a warehouse receipt by one under an assignment from the person to whom it was issued, is evidence of the holder's title to the property specified in the receipt, and one dealing for the property with such holder without notice of any defect in his title, or of facts to put a prudent person on inquiry, will be protected. *Chicago Dock Co.* v. *Foster,* 48 Ill. 507.

The rule that the purchaser of a chattel acquires no better title than his vendor, has no application to negotiable paper. *Murray* v. *Lardner,* 2 Wall. 110; *Hotchkiss* v. *National Bank,* 21 id. 354.

The verdict and judgment were for the value of the grain, whereas the suit was for the value of the warehouse receipts.

Messrs. STILES & LEWIS, for the appellees:

As between appellees and Ranney & Co., the title never passed to the latter. Where personal property, other than commercial paper not due, is sold for cash, the title does not vest in the purchaser until payment is made, even though the property is delivered to the purchaser. 2 Schouler on Personal Prop. 292–300; *Paul* v. *Reed,* 52 N. H. 156.

The taking of a check for the price of goods sold is not a payment, but a means whereby to obtain the money, and when the check is dishonored, as between the buyer and

seller the property, though delivered, will not pass.   *King* v.
*Strong,* 35 Ill. 9 ; *Matthews* v. *Cowan,* 59 id. 341.

The transfer of warehouse receipts is governed by the
same rules in respect to notice of the rights of third parties,
as obtain in the transfer of chattel property.   When chat-
tels are sold and delivered under such circumstances that the
title remains in the vendor until the performance of some
condition, a *bona fide* purchaser for value from such vendee
will acquire a good title thereto.   But if the latter purchaser
has notice of the rights and equities of the original vendor,
his title will be subject to such rights and equities.   *Smalley*
v. *Ellett,* 36 Ill. 500 ; *Barnard* v. *Campbell,* 58 N. Y. 73.

The delivery of a warehouse receipt has the same, and no
greater, effect than the delivery of the property itself.   *Bur-
ton* v. *Curyea,* 40 Ill. 320.

The statute does not make such receipts negotiable as
commercial paper, with all the incidents attending the trans-
fer of bills of exchange.   *Shaw* v. *Railroad Co.* 101 U. S. 557.

The bank, when it took the receipts from Ranney & Co.,
had constructive notice of Ranney & Co.'s want of title
thereto, and therefore took no better title than they had.

The receipts represent the grain, which can not be obtained
without a surrender of the receipts, properly indorsed.   (Sec.
11 of Warehouse act.)   Their conversion, therefore, is equiva-
lent to a conversion of the grain, and the measure of damages
is the value of the grain.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The question is presented by the ruling of the circuit court
in the giving and refusing of instructions, whether warehouse
receipts are placed on the same footing, as respects the title
vested in the assignee in case of assignment, as bills of
exchange and promissory notes ; and this is the question
most elaborated by counsel in argument, and the first in
order for consideration.

The contention of counsel for appellant is, the language of our statute in relation to negotiable instruments, (Hurd's Stat. 1881, chap. 114, sec. 142,) comprehends warehouse receipts. They admit that this court, in *Burton* v. *Curyea*, 40 Ill. 320, (which was decided in 1866,) laid down a contrary doctrine, and that our statute in relation to negotiable instruments has since, or for many years prior to, that decision received no material change,—that if it now includes warehouse receipts, it did then; but they contend that that decision was wrong, and should not be adhered to. We might content ourselves by saying *stare decisis*, for *Burton* v. *Curyea* was argued by able counsel, and, as the opinion shows, the case was carefully considered by the court. But in our opinion it is demonstrably certain that the language of our statute in relation to negotiable instruments does not comprehend warehouse receipts or bills of lading, and instruments of that class. Its precise phraseology, as applicable to this question, is: "Promissory notes, bonds, due bills, and other instruments in writing, made or to be made by any person, body politic or corporate, whereby such person promises or agrees to pay any sum of money or articles of personal property, or any sum of money in personal property, or acknowledges any sum of money or article of personal property to be due to any other person."

It is a familiar rule of construction that a statute is not to be construed as changing the common law farther than its terms expressly declare. (*Cadwallader* v. *Harris*, 76 Ill. 372; *Thompson* v. *Weller*, 85 id. 197.) We are not, therefore, at liberty to declare that this statute embraces covenants or agreements for the performance of individual services in and about property,—mutual, dependent and conditional covenants and agreements, or covenants and agreements to pay money or deliver property upon uncertain contingencies or events,—but must hold that it applies only to absolute and unconditional promises to pay money or deliver property.

19—106 Ill.

Such was the character of each one of the cases cited by counsel for appellant. Without referring to and analyzing these cases separately and at length, we simply call attention to the fact that in every case in which this court has held an instrument negotiable by virtue of our statute in relation to negotiable instruments, the instrument is payable at some time certain,—absolutely,—and embraces no covenant or agreement other than for the payment of money or the delivery of property. On the other hand, it has been repeatedly held, where instruments embraced covenants or agreements for personal services, and where instruments for the payment of money or delivery of property provided for such payment or delivery only upon some uncertain or contingent event, that they were not negotiable under the statute. Thus, in *Beezley* v. *Jones,* 1 Scam. 34, Beezley covenanted, by deed with Jones, to lease him a house, carding machine and apparatus, for a specified time, and further agreed to be at the expense of repairing the machine in case of any failure. Jones, on his part, covenanted to pay $170 rent, by installments, and at the expiration of the term to return the machine, etc., in the same order he received them, the common wear excepted. The deed was assigned by indorsement to the plaintiff, who sued for a breach of the covenant to pay rent. It was held the assignee could not maintain a suit in his own name, and the court, referring to the statute in relation to negotiable instruments, said: "Neither the language of the statute nor the policy that occasioned its enactment, embraces instruments in writing for the conveyance of land, or for the performance of personal duties, and the legislature never intended to impart a negotiable quality to a written agreement for the performance of perhaps twenty stipulations of different characters, merely because it contained one for the payment of money, or the delivery of an article of personal property."

In *Kelley* v. *Hemmingway*, 13 Ill. 604, the instrument sued on was one wherein David Kelley acknowledged there to be due to Henry D. Kelley $53, "when he is twenty-one years old." It was held to be not a negotiable instrument under our statute, because the event upon which it was to become due might never occur.

*Smalley* v. *Edey*, 15 Ill. 324, was an action to recover upon an instrument in writing, whereby Smalley agreed to pay Edey $148.27, provided he did not settle said amount with Richard Hoover, and Edey was compelled to pay the same to Hoover. It was held this was not a promissory note, because it was payable on a contingency that might never happen.

In *Gillilan* v. *Myers*, 31 Ill. 525, the instrument sued upon was this:

"ALGONQUIN, *June 8, 1857.*

"MR. MYERS: Sir—You will please take up my note, payable to Samuel Smith, for $202, with ten per cent interest from the first of April, and it will be right, as we talked.

JOHN GILLILAN."

It was held this was not a bill of exchange—that it was a mere letter of request, and payable on the contingency that Smith should present the note, which he might never do.

In *Kingsbury* v. *Wall*, 68 Ill. 311, we held an order drawn on another, and accepted by him, for the payment of a certain sum in goods, payable on condition the payee shall have in his hands, ready to be delivered to the drawer, a deed from the payee and wife for certain property described, and making the delivery of the goods and the deed simultaneous acts, is not assignable either at common law or under the statute, as the contingency upon which payment is to be made might never happen. And we held in *Husband* v. *Epling*, 81 Ill. 172, an undertaking to pay a specified sum when an estate named is settled up, is not negotiable under the statute, since the estate might never be settled up.

Other cases illustrating the principles involved might be referred to, but we deem these sufficient. They render it clear that the promise or undertaking must be restricted to the payment of money or delivery of property at a time that will certainly happen. It may be unknown, in advance, when it will be, but it must be absolutely certain that it will be some time; and although it may be within the power of the party to whom the promise is made to render it certain, by his subsequent act, that the time will happen, this will not be sufficient,—it can not depend upon his will or pleasure.

The warehouse receipt is, strictly, but the written evidence of a contract between the depositor of grain and the warehouseman. It is an acknowledgment by the latter that he has received and holds in store for the former the amount and description of grain named in the receipt, and from this acknowledgment the law imposes certain duties upon the warehouseman, which become as much a part of the contract as if written at length in the receipt. At common law the duty of the warehouseman was, that he should take common and reasonable care of the commodity intrusted to his charge, but he was not obliged, at all events, to return the property, nor in the same condition and quality. If he took common and reasonable care of it, and still it was stolen, or destroyed by rats, or otherwise materially damaged, he was not responsible. (Story on Bailments, sec. 442.) And by our present statute, "no public warehouseman shall be held responsible for any loss or damage to property by fire while in his custody, provided reasonable care and vigilance be exercised to protect and preserve the same; nor shall he be held liable for damage to grain by heating, if it can be shown that he has exercised proper care in handling," etc. (Rev. Stat. 1874, ch. 114, sec. 16.) Nor is the warehouseman required to deliver the property for which his receipt is given until the "return of such receipt, properly indorsed, and the tender of all proper charges upon the property represented by it."

(Id. sec. 11.)   It is therefore impossible that it can, in advance, be known with absolute certainty that the warehouseman will ever be required to deliver the wheat.   It is precisely as if the promise were to deliver it upon condition that none of these things allowed as excuses for non-delivery should intervene, as well as upon the further condition actually written in the receipt—the return of the receipt and the payment of all charges upon the property.

Waiving this point, however, counsel for appellant claim that the General Assembly, to meet the decision in *Burton* v. *Curyea,* and establish the law otherwise than as there declared, enacted, by section 12 of an act entitled "An act regulating warehousemen, and authorizing connections of railroads with warehouses, and for other purposes," approved February 16, 1867, that "all receipts for grain issued by any warehouse shall be negotiable, by indorsement in blank or by special indorsement, in the same manner and to the same extent as bills of exchange and promissory notes are."   But this act is repealed by "An act to regulate public warehouses, and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of this State," approved April 25, 1871, which act is incorporated in the revision of 1874, and is the law in force at the time of the transactions out of which the present suit grew.   If, therefore, it be true, which we do not concede, that the legislature intended, by section 12 of the act of 1867, to enact a different rule with regard to the effect of the assignment of warehouse receipts, the same logic proves that by section 24 of the act of April 25, 1871, the General Assembly intended to restore the rule as announced in *Burton* v. *Curyea,* for in that section, instead of making warehouse receipts negotiable by indorsement, "in the same manner and to the same extent as bills of exchange are," this language is substituted:   "Warehouse receipts for property stored in any class of public warehouses, as herein described, shall be transferable by the indorsement

of the party to whose order such receipt may be issued, and such indorsement shall be deemed a valid transfer of the property represented by such receipt, and may be made either in blank or to the order of another." Thus, the indorsement of the symbol is made evidence of a transfer of that which it represents—nothing more. If, instead of the warehouse receipt, the property is present, and, upon sale, is actually delivered to the purchaser, this is evidence of a valid transfer of the property. The receipt, in the absence of the property, enables the parties, through its indorsement, to effect the same thing they could effect if the property were present, by its actual delivery,—namely, a valid transfer. But this neither authorizes nor implies that a title which the seller does not possess, shall pass in the one case any more than in the other.

A very satisfactory case, to us, on this question, is *Shaw* v. *Railroad Co.* 101 U. S. (11 Otto,) 557. In that case the question was on a bill of lading issued in Missouri on property to be carried from St. Louis, in that State, to Philadelphia, in Pennsylvania. The court deems it unimportant whether the statute of Missouri or that of Pennsylvania shall be regarded as affecting the contract, since there is, in its opinion, no substantial difference between the statutes of the two States in that regard. The language of that of Pennsylvania is, they—*i. e.*, bills of lading—"shall be negotiable, and may be transferred by indorsement and delivery," while that of Missouri is, "they shall be negotiable by written indorsement thereon and delivery, *in the same manner* as bills of exchange and promissory notes." The court holds that the words in these statutes relating to the negotiability of bills of lading apply only to the transfer of the instrument, and do not determine that the rights of assignees shall be the same as the rights of assignees of bills of exchange, etc., after transfer. It is said in the opinion: "A bill or note past due is negotiable if it be payable to order, or bearer, but its indorse-

ment or delivery does not cut off the defences of the maker or acceptor against it, nor create such a contract as results from an indorsement before maturity, and it does not give to the purchaser of a lost or stolen bill the rights of the real owner. It does not necessarily follow, therefore, that because a statute has made bills of lading negotiable by indorsement and delivery, all these consequences of an indorsement and delivery of bills and notes before maturity ensue, or are intended to result from, such negotiation." The court then proceeds to show that bills of exchange and promissory notes are exceptional in their character, and the reason why the *bona fide* purchaser of a bill, etc., for value, is not bound to look beyond the instrument, and then adds : "The reason can have no application to the case of a lost or stolen bill of lading. The function of that instrument is entirely different from that of a bill or note. It is not a representative of money, used for the transmission of money, or for the payment of debts, or for purchases. It does not pass from hand to hand, as bank notes or coins. It is a contract for the performance of a certain duty. True, it is a symbol of the ownership of the goods covered by it,—a representative of those goods ; but if the goods themselves be lost or stolen, no sale of them by the finder or thief, though to a *bona fide* purchaser for value, will divest the ownership of the person who lost them, or from whom they were stolen. Why, then, should the sale of the symbol or mere representative of the goods have such an effect?" Again, it is said in the opinion : "Bills of lading are regarded as so much cotton, grain, iron, or other article of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose, and performing different functions. It can not be, therefore, that the statute which made them negotiable by indorsement and delivery, or negotiable *in the*

*same manner* as bills of exchange and promissory notes are negotiable, intended to change totally their character,—put them, *in all respects,* on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes."

But counsel for appellant make the point that if the sale made by appellees to Ranney & Co. was made of non-effect by the failure to pay the check, and appellant had such notice as would charge it as the purchaser of chattel property, and the warehouse receipts gave appellant no better title than if it had taken the grain itself, then the title of the grain was in appellees, and they could not recover its value from appellant. The answer to this is, the receipts stand in the place of the grain. Their possession is regarded as the possession, in law, of the grain itself, and the warehouseman, as has been seen, is not required to surrender the grain until the delivery of the receipts and the payment of charges. The suit, therefore, is in effect for the grain the receipts represented, and in recovering for them, therefore, the recovery was properly for the value of the grain,—that for which they stand.

Another point insisted upon by counsel for appellant is, that to enable appellees to defeat the title of Ranney & Co. to the receipts, it was necessary to show that the sale was for cash, and that a check was given therefor which was not paid,—that to defeat the title of appellant it was necessary for appellees to prove that appellant knew, or had some reason to believe, that the sale was for cash, and that a check was given therefor which had not been or would not be paid, and that there is no evidence whatever that appellant knew, or had reason to believe, that the sale was for cash. It is, in our opinion, sufficient to say these are purely questions of fact, upon which the finding of the Appellate Court is conclusive. *Bridge Co.* v. *Comrs. of Highways,* 101 Ill. 518; *Fitch* v. *Johnson,* 104 id. 111.

The objection that questions of law and fact are submitted to the jury by certain of appellees' instructions, we do not deem well founded. The whole case proceeds upon the theory that appellees were owners of the warehouse receipts, and continued to be such until, and unless, their ownership was divested by the sale to Ranney & Co. There is no controversy, either in the evidence or in the arguments of counsel, in this regard. In the first and second instructions, given at the instance of appellees, the jury were fully instructed as to the law, on appellees' theory of the case, relating to the sale, the effect whereof being, that if the facts were as claimed by appellees, then Ranney & Co. had no title, and, by necessary consequence, appellees still remained owners. These instructions precede those complained of by appellant's counsel, so when, by those, the jury were instructed that if they found Ranney & Co. had no title, etc., —and if they found appellees were owners, etc.,—they ought to have understood, and we think it should be presumed they did understand, it was meant, if, under the rule laid down in the preceding instructions, they found that Ranney & Co. had no title, and if, under such rule, they found appellees were owners, etc. They had been placed under the duty of being governed by the rules laid down by these instructions in passing upon these facts, and there is nothing from which they could have assumed they were to be released therefrom in making the findings contemplated in the instructions objected to. We think, as here presented, the instructions should be considered as announcing a series of consecutive and dependent propositions in a single charge.

The objection to the modification of appellant's second instruction is without merit. The law is, undoubtedly, correctly laid down in the instruction as modified, and, therefore, even if it be conceded the instruction would have been correct without that modification, the modification could do no harm.

It is not contested, in argument, that the law is, where personal property, other than commercial paper, is, by contract, sold for cash, to be paid on delivery, the delivery and payment are to be concurrent acts, and, therefore, if the goods are put into possession of the buyer in expectation that he will immediately pay the price, and he does not do it, the seller is at liberty to regard the delivery as conditional, and may at once reclaim the goods. (See Schouler on Personal Prop. 292-300; *Paul* v. *Reed;* 52 N. H. 136.) And an attempted payment by a draft or check which is dishonored is no payment. (*Mathews* v. *Cowan,* 59 Ill. 341.) And in such case trover lies for the recovery of goods, possession of which is obtained by such attempted payment. (Id.)

We perceive no substantial reason for disturbing the judgment below. It is therefore affirmed.

*Judgment affirmed.*