FIRST NAT. BANK OF BYARS v. ELDRIDGE *et al.*

No. 404. Opinion Filed June 1, 1910.

(109 Pac. 62.)

1. CUSTOMS AND USAGES—Subverting Rules of Law. It is well settled that usage cannot be held to subvert the settled rules of law.

2. WAREHOUSEMEN—Liability on Receipts. The growers of certain cotton stored it in bales in the warehouse of the firm of E., S. & R., at M., who issued warehouse receipts for the same and delivered them to the growers. Afterwards the growers sold

the cotton to the firm of S., S. & S., and delivered the warehouse receipts to them. S. S. & S., presented the receipts to the warehousemen and received the cotton, the warehousemen returning the receipts to them for the purpose of verifying the weights at B. **After receiving** the cotton from the warehousemen at M., S., S. & S. sold it to one B, and turned the warehouse receipts over to him for the purpose of verifying weights at B. At B according to the testimony of the cashier, B. put up, as collateral to protect his overdraft at the First National Bank the warehouse receipts issued at M. **Held,** in an action by the bank against the warehousemen to recover the cotton or the value thereof, that the bank is not entitled to recover.

(Syllabus by the Court.)

*Error from District Court, Garvin County; R. McMillan, Judge.*

Action by the First National Bank of Byars against J. T. Eldridge and others. Judgment for defendants, and plaintiff brings error. Affirmed.

*J. W. Hocker,* for plaintiff in error.

*J. T. Blanton* and *L. C. Andrews,* for defendants in error.— Citing: *Hearne v. Ins. Co.,* 20 Wall. 488; *Barnard v· Kellogg,* 10 Wall. 383; *Citizens' Bank v. Ark. C. & W. Co.* (Ark.) 96 S. W. 997; *Allen v. Bank,* 120 U. S., 30 L. Ed. 573; *Burton, v. Curyea* (Ill.) 89 Am. Dec. 350; *Second Nat. Bank v. Waldridge,* 2 Am. Rep. 408; *Clay v. Gage* (Tex. Civ. App.) 20 S. W. 948; *Com· Nat. Bank v. Bemis* (Mass.) 58 N. E. 476.

KANE, J. This was an action commenced by the plaintiff in error, First National Bank of Byars, as plaintiff, against the defendants in error, J. T. Eldridge, J. A. Smith, and J. T. Rotenberry, partners, as defendants, to recover the value of several bales of cotton represented by certain warehouse receipts. The petition alleged, in substance, that during the months of November and December, 1905, the defendants were engaged in the business of warehousemen at McGee, Ind. T., for the purpose of receiving, caring for, and storing cotton in bales for the public, and, as the custom and common usage among such cotton yards during the time aforesaid, received into its warehouse, from divers

and various persons, bales of cotton, for which it issued the warehouse receipts involved; that, according to said custom, said cotton yard tickets represented the cotton so deposited and the holder of such tickets became and was the owner of the cotton represented thereby; that plaintiff in due course of business as a bank, relying upon the possession of said ticket and the custom and common usage aforesaid, advanced to one N. C. Bowie on his overdrafts drawn on said bank the sum of $900, and received said cotton yard tickets in due course as security; that plaintiff in due course of business and within reasonable time presented and returned said tickets to said defendants then and there, offering to pay all charges arising therefrom, and demanded the cotton represented by the tickets, and, although the defendants were in duty bound to deliver said cotton to plaintiff, they wholly failed so to do, to the great damage of plaintiff, in the sum of the value of said cotton.

The defendants' answer admitted that they were partners and the owners of the McGee cotton yard, and stated the facts in relation to the issuance of the warehouse receipts to be, in substance, as follows: That during the months of November and December, 1905, they received the cotton covered by the receipts, and took the same for storage purposes; that they issued their receipts for said cotton, and delivered the same to the persons storing the cotton; that in each instance the ticket was filled out to suit the particular circumstances and conditions of the transaction; that, after the cotton was stored, it was purchased by one Sanford, representing the firm of Sanford, Schultz & Strickland; that on the 9th day of December, 1905, said firm being the owners of said cotton, and having and holding in their possession said cotton yard tickets, the cotton was turned over to them, and they were permitted to retain the receipts for the purpose of verifying the McGee weights, upon the cotton being weighed at Byars; that the cotton tickets issued for the cotton mentioned in plaintiff's complaint were delivered by the defendant to said firm to be used

by them in verifying said weights in the manner above alleged, and for no other purpose.

The reply of the plaintiff was in effect a general denial. Upon the trial to a jury, there was a verdict for the defendants, upon which judgment was duly rendered, to reverse which this proceeding in error was commenced.

Counsel for plaintiff in error in his brief assigns three grounds upon which he contends the judgment ought to be reversed: (1) The court erred in sustaining the objection to introduction of testimony tending to prove the existence of the custom alleged in his petition; (2) that the court erred in refusing to instruct the jury that cotton yard tickets issued as had been given in evidence in this case are symbolical of the cotton, and the transfer of such receipts, with or without indorsement, operates as a real delivery of the cotton, and a *bona fide* holder of such receipts on presentation thereof to the yard issuing the same and the payment of the yardage is entitled to the cotton itself; (3) that the court erred in refusing to instruct the jury that, if the loss in this case had been caused by the negligence or carelessness of the defendants and through no fault of the bank, the defendants are estopped by reason of their negligence or carelessness, and the plaintiff must recover herein.

We are convinced there is no merit in any of these contentions. This action amounts to a suit for damages for conversion —the plaintiff treating the cotton tickets as warehouse receipts, and the defendants admitting such to be their legal effect. The allegations of plaintiff's petition pertaining to the existence of a custom or usage constitute nothing more than a statement of the law governing warehouse receipts generally, and, of course it was not necessary to introduce evidence on that point, and the court very properly excluded all offered for that purpose.

The evidence on the part of the plaintiff is to the effect that during that cotton season they had permitted Bowie to overdraw

his account at the bank in the neighborhood of $900. The cashier of the bank testified as follows:

"Q. How did the bank get into the possession of those tickets? A. Mr. N. C. Bowie gave them to us. Q. Under what conditions? A. Mr. Bowie was buying cotton out there, and he delivered the cotton tickets to the bank. He put them up for collateral."

This, and an attempt to establish the usage in force, made the plaintiff's case. The evidence on behalf of the defendants was to the effect that the cotton was stored at McGee by the cotton growers and tickets were issued to them. Afterward the cotton was sold to a firm of cotton buyers, and the receipts issued to the growers were turned over to them. The cotton buyers presented the tickets to the defendants, received the cotton, and were permitted to retain the tickets to take with them to Byars, so that if the cotton fell short in weight there, they could come back on the yard at McGee to make up the difference. Mr. Bowie testified in effect, that he was buying cotton on the Byars market that season, and was checking on the First National Bank at Byars; that he bought the cotton in question from the firm that purchased it at the McGee yard, and also received the McGee cotton tickets; that he then stored the cotton at Byars, and received cotton tickets from that yard also. Mr. Bowie testified further in relation to the McGee tickets as follows:

"Q. What did you do with them? A. I had a jacket in my bank at Byars, a drawer I kept them in, and I put them in the jacket in the drawer, as well as I remember. Q. Did you ever, at any time, put them up with Mr. Kandt (the cashier) as collateral security for any indebtedness you owed the bank or him? A. No, sir. Q. Did you deposit this lot of tickets or any lot of tickets from the McGee cotton yard with the bank, or did you deposit the tickets of the Byars yard with the bank? A. Deposited the Byars yard's tickets. Q. What became of these tickets? A. Well, after we got into the wrangle there—I had a jacket that I had them in, and I never could get hold of any of those tickets, and I never did know what became of it. Q. What became of this cotton? A. It was sold and the proceeds left in this bank. Q. What bank? A. The First National Bank of Byars."

The foregoing evidence raised the only issue of fact to be tried by the jury, and on that alone a verdict for the defendants might very well have been returned. Moreover, aside from the only disputed question of fact being found in favor of the defendants, they were entitled to prevail upon the facts admitted. There was an instruction as follows:

"If you believe from the evidence that the defendants in good faith delivered the cotton represented by said tickets to G. R. Sanford, representing his firm of Sanford, Schultz & Strickland, and that said firm was at the time the owner of said cotton, then the obligations assumed by the defendants in the issuance of said tickets were fully performed, and the plaintiff could not thereafter acquire any rights against the defendants by any purchase or advancement upon said tickets, and your verdict should be for the defendant."

The facts stated in this instruction are admitted to be true, and we think it fairly states the law applicable to the facts. The rule seems to be that if the warehouseman had placed the receipts in the hands of Bowie for any other than a legitimate purpose, or if they were fairly chargeable with any negligence by means of which Bowie had been enabled to impose upon the bank, the warehouseman would be liable. *Burton v. Curyea*, 40 Ill. 320, 39 Am. Dec. 350.

The facts in the *Burton Case, supra*, were as follows: Daggett and Whiteside were pork packers in the city of Chicago, and about the 1st of January, 1865, sold to Curyea 500 barrels of pork, and delivered to him 5 warehouse receipts of Burton, the appellant, who had the pork on storage in his warehouse. By the terms of the receipts, the pork was deliverable to the order of Daggett and Whiteside, upon the surrender of the receipts and the payment of charges. The receipts were indorsed in blank by Daggett and Whiteside. Subsequent to the purchase by Curyea, he desired to have the pork overhauled and repacked, and, in order that this might be done by Daggett and Whiteside, he delivered the receipts back to them. They thereupon pledged the receipts to a bank called the State Savings Institution as security

for advances of money, and on the 15th day of June, 1865, the bank sold them to Micheal Leary, Daggett and Whiteside having failed to pay their debt to the bank. It should be further stated that, when in January Curyea wished to complete the payment upon the pork to Daggett and Whiteside, he borrowed the money, through the agency of the bank, from one Jared Gage, and the bank took his note payable to Gage, and took as security these 5 receipts calling for 100 barrels each. The cashier testified that the bank had at that time more than these 5 receipts on deposit belonging to Daggett and Whiteside, and he selected five from the parcel, and pinned them to the note given to Curyea, and passed the amount of Gage's check to the credit of Daggett and Whiteside. The note was paid the last of March, and the cashier then gave the receipts to Curyea. He further testified that the bank had at various times from 12 to 15 of these receipts deposited by Daggett and Whiteside, each calling for 100 barrels, and that when he received the 5 receipts from them in June, which the bank subsequently sold to Leary, he did not know they were the same receipts delivered in March to Curyea, and that they kept no record of numbers or dates. Soon after Leary bought, he was about to remove the pork from Burton's warehouse, when Curyea commenced this action of replevin against Burton. Burton pleaded property in Leary and property in himself. On the trial the plaintiff tendered Burton his warehouse charges, which he accepted, and the only issue presented to the jury was the question of ownership as between Curyea and Leary, who, though not a party to the record, was represented by counsel. There was a verdict for the plaintiff on this issue, upon which judgment was rendered, and the defendant appealed. Mr. Justice Lawrence, who delivered the opinion of the court, sums up the law as follows:

"If Curyea in the case before us had placed the warehouse receipts in the hands of Daggett and Whiteside for any other than a legitimate purpose, or if he was fairly chargeable with any negligence by means of which they had been enabled to impose upon the bank, a different rule might be applied. But we can

discover no negligence on his part nor any departure from the regular course of business."

The sixth paragraph of the syllabus reads: .

"Purchaser of pork in warehouse who takes warehouse receipts therefor, indorsed in blank by his vendor, and then, to enable the vendor to withdraw the pork from the warehouse for the purpose of overhauling and repacking it, delivers the receipts back to the vendor, who transfers them to a *bona fide* purchaser, still remains the owner of the pork, and may maintain replevin for it against the warehouseman, for there was no negligence on his part, or any departure from the ordinary course of business; nor is he chargeable with negligence because he did not surrender the original receipts and take out new ones in his own name before delivering them back to the vendor, since this would not have guarded third persons against the fraud of the vendor."

In the case at bar there is no doubt that the growers turned the warehouse receipts, together with the cotton represented by them, over to the firm of Sanford, Schultz & Strickland for a legitimate purpose in due course of business, and that the plaintiff did not suffer any damage by this act. If it was injured at all, it must have been by the act of Sanford, Schultz & Strickland in turning the receipts over to Bowie, thus enabling him to pledge them to the bank. With this act the warehousemen had nothing to do.

Being satisfied upon the whole record that the plaintiff had a fair and impartial trial, the judgment of the court below will be affirmed.

All the Justices concur.